# WHEELING.

MAURICE *v.* DEVOL *et als.*

Submitted June 20, 1882—Decided December 15, 1883.

(*WOODS, JUDGE, Absent.)

1. The Federal courts have exclusive jurisdiction to decide whether a patent could issue upon an alleged invention, yet where a cause of action relates to the subject-matter of a patent-right, it is within the jurisdiction of the State courts.   (p. 253.)

2. Equity always has jurisdiction of causes involving the fraud of one party against the other, unless the party who seeks relief was himself guilty of fraud in the transaction,   (p. 254.)

3. Letters-patent issued to a person afford a *prima facie* presumption that he, who is named as inventor, is the original and first inventor of what is described as the improvement; and the burden of proof to sustain an opposite conclusion is on him who denies that such person is the original inventor.   (p. 254.)

4. When an invention has an actual or potential existence, an interest in such invention may for a valuable consideration be assigned to a third person, and when so assigned, such person will have such interest in the patent afterwards issued to secure such invention.   (p. 255.)

5. An agreement, which operates as a transfer of a patent or interest therein, is good against a patentee and all who purchase with notice, though not recorded.   (p. 257.)

6. Where a suit in equity is brought to relieve a person from the effect of a fraud practiced upon him, relief may be granted to such party, but not to one, on a prayer for affirmative relief in his answer, who admits, that he participated in the fraud complained of.   (p. 258.)

The facts of the case are stated in the opinion.

*Cause submitted before Judge Woods was appointed.

*John A. Hutchinson* for appellant.

*Barna Powell* for appellee.

JOHNSON, PRESIDENT:

In November, 1871, the plaintiff, Theodore L. Maurice, filed his bill in the circuit court of Wood county against Benjamin R. Murphy, J. L. Devol, W. C. Raleigh, Charles T. Demming and S. Prager, in which he alleged, that Murphy was the inventer of two new and valuable inventions, one for cutting splits, and the other for weaving said splits into window blinds; that he had them nearly perfected, and desired when they should be perfected, to make application for patents therefor, but had not the means necessary to procure said patents, and proposed to plaintiff, if he would procure a party, who would pay down in cash one hundred dollars, he would assign and set over to said plaintiff one third of his interest in and to said letters patent when obtained; that plaintiff did procure one, the defendant Raleigh, to pay said money, and on the — day of February, 1871, an agreement in writing was entered into between said Murphy, Raleigh and the plaintiff, whereby in consideration of the money then and thereafter to be paid by said Raleigh and in consideration of certain labor and services rendered said Murphy by the plaintiff, as expressed in said agreement and acknowledged over his signature and seal, he sold and assigned to the said plaintiff and the said Raleigh each one undivided one third interest in and to the said tool for cutting splits, and the said loom for making blinds, and to all improvements that might thereafter be made by said Murphy or his assigns in either of said machines, and one undivided third interest in all rights thereafter secured by said Murphy and his assigns in letters-patent for said inventions; that it was provided in said agreement that all profits arising from the sale of any interest in or to either of said improvements, or in the manufacture and sale of window-shades from the machines, should be equally divided share and share alike, between the plaintiff, Raleigh and said Murphy; that a short time after said agreement was made, plaintiff went to Chattanooga, Tennessee, with the knowl-

edge and consent of said Murphy and Raleigh, with a view of introducing the notice of said improvements in the Southern States and making negotiations for sale of them as soon as patents were issued, and models were sent to him by said Murphy; that Murphy never sent any models, but soon after plaintiff left, said Murphy obtained possession of the written agreement aforesaid and still holds the same and refuses to surrender it, and wholly ignores it.

He charges in the bill that Murphy disregarding his said agreement and J. L. Devol well knowing the rights of the plaintiff in the said improvement conspired and confederated for the purpose of defrauding the plaintiff out of his legal rights in and to said split cutter and loom; and that said Murphy did on the —— day of ——————, 1871, sell and convey to J. L. Devol one undivided one third interest in said loom and split cutter, the said Devol having notice of plaintiff's interest; that to defraud plaintiff they jointly obtained letters-patent for said inventions; that said applications were made by Devol and Murphy for the purpose of evading the contract, by which plaintiff acquired one third interest therein; that patents were granted to said Murphy and Devol; that plaintiff is the owner of a one third interest in said patents for each of said improvements, and is entitled to one third of all the profits that have accrued or may hereafter accrue from sale of window-blinds, or any sale of any interest in said letters-patent; that Murphy and Devol are pretending to be sole owners of said letters-patent and have bargained and sold to defendants, C. T. Demming and Prager, two undivided thirds of said interests and title secured by said letters-patent, for the sum of two thousand six hundred and sixty-six dollars and sixty-six and two thirds cents, of which one thousand three hundred and thirty-three dollars and thirty-three and one third cents is to be paid in hand and the balance is to be paid in eight months from the execution of the assignment of the said two thirds interest; the plaintiff is informed and believes that said money is claimed by Murphy, and that it will be paid to him by Demming and Prager; that Murphy is insolvent, and if the said money is paid to him plaintiff will get nothing. He prays for an account of the blinds manufactured and sold, &c., that

Murphy and Devol be restrained and enjoined from selling any interest in said inventions, and that Demming and Prager be enjoined from paying over said purchase-money, and for general relief.

The injunction was granted October 23, 1871. Murphy answered the bill, and in his answer denies any interest whatever of said Maurice in and to said inventions; admits he sold to Raleigh an interest therein, and admits that he received one hundred dollars from him on the sale, and made a written agreement, in which Murphy says, "it was expressly provided that if the said model of a shade or blind-loom having the capacity to weave one hundred yards in ten hours was not completed within said ten days," then the contract should be null and void; admits he was to transfer one third interest to plaintiff, if he would pay one third of the patent-office fees and expenses, when models for said inventions were completed, which time of completion was expressly fixed at ten days from the 26th day of February, 1871; that plaintiff went out of the State a short time after, and was not here at the end of the ten days nor for a long time afterwards, and did not call upon respondent nor tender the fees; that plaintiff was not bound to pay anything to respondent until respondent secured by invention a loom of the capacity aforesaid, which respondent was unable to do; that defendant, Raleigh, called on respondent, and claimed that by the terms of the contract it had become null and void; that Raleigh wrote the word "cancelled" on the face of the contract, and left it with respondent, and by some means unknown to respondent it was "reached by some vermin or animal and destroyed." He says he abandoned his machines, and the defendant, Devol, had a *split cutter* and loom for weaving splits, and that Devol employed him to make his models, and agreed to give respondent an interest therein; that Devol's machines were materially different from his, and that patents had been allowed to Devol and respondent. The answer avers, that Prager and Demming were to pay the money to Devol.

Devol answered and denies any knowledge of plaintiff's interest in Murphy's inventions. He admits that in March or April, 1871, the defendants, Raleigh and Murphy, "in the

presence of respondent exhibited a paper in reference to an invention of some machine-loom or cutter, which Raleigh claimed was null and void, and that he was no longer bound by it, and that it was or ought to be cancelled; that respondent has heard read that part of the answer of his co-defendant, Murphy, which relates to the terms of said contract, and to the best of respondent's recollection the statement of said Murphy is in substance correct; that at the time now referred to the said Raleigh took a pen and wrote the word 'cancelled' across the face of the paper and handed it to Murphy."

Devol in his answer further says he had an invention of a split-cutter and loom essentially different from Murphy's; that he agreed with Murphy, if he would do certain work, make the models, &c., that he would give him an interest in letters-patent for his machines. He denies that he had anything to do with the original machines, denies all fraud and collusion, &c., and denies that plaintiff has any interest in the sale made to Demming and Prager.

The contract with Demming and Prager is exhibited with Devol's answer, and it recites that Devol and Murphy "have invented a new and useful improvement in tools for cutting splits, for which a patent was allowed on the 20th day of May, 1871. We have also invented a new and useful improvement in loom for weaving blinds, for which a patent was allowed July —, 1871; that letters-patent are now ready to be issued by the United States Patent-Office for each of the above inventions at any time within six months from the 20th day of May, 1871, and the 1st day of July, 1871, respectively, upon the payment of twenty dollars in each case, &c."

W. C. Raleigh filed his answer, in which he admits all the material allegations of the bill, and shows how he came to cancel the contract executed by Murphy with himself and Maurice. He avers "at the time this respondent paid the last one hundred dollars to Murphy, * * the defendants Murphy and Devol came to this respondent, where he was at work in Parkersburg, and had with them applications for patents for each of said improvements as *joint inventors* thereof, sworn to in proper form before a notary public, and Murphy

stated that before Maurice should have any interest in said improvements under the agreement entered into with him and this respondent, he would never apply for patents thereon, but said defendants then and there proposed to me that if I would write the words 'we the undersigned herewith cancel this agreement' and sign my name to it, together with the name of the defendant, Murphy, this respondent should retain and hold his individual one third interest in said improvements, the same as if said agreement was not cancelled; that they only desired this respondent to cancel this agreement and enter into the new arrangement for the purpose of defeating the interest of Maurice in the agreement. They also exhibited to him the application for patents and pointed out where this respondent's name would be entered on the application as assignee; that a few days after he paid the one hundred dollars, he paid to said Devol and Murphy the sum of thirteen dollars and thirty-three cents as his share of the fees attending the procurement of patents on said invention. This respondent expressly charges, that the cancelling of said agreement was for the sole and exclusive purpose of aiding in connection with the joint application of Devol and Murphy, as inventors to defeat Maurice's interest, and this respondent only cancelled his own interest on said agreement under the arrangement made on condition that his name was to be inserted in the application as an assignee of a one third undivided interest in said invention, and that he was not authorized to cancel for Maurice." He further states that under this arrangement respondent, Murphy and Devol, entered into a partnership to manufacture blinds; that he made an arrangement afterwards, by which he withdrew from the partnership but retained his one third interest.

Depositions were taken. Murphy recklessly, it seems to me, gave his testimony. Raleigh, while admitting his perfidy and his participation in the fraud, tells a consistent story which has much corroboration in the record. Maurice and Powell both say, that shortly after the injunction was served, Murphy promised to bring the *agreement made* between him and Maurice and Raleigh; but soon after said he had been advised by counsel not to produce it, admitted that he had it. Maurice, Guess, Powell and Raleigh, all swore to the con-

tents of the agreement substantially as set out in the bill. It is proved to our entire satisfaction, that the invention was almost complete, when the contract was made, and that Devol, Murphy and Raleigh entered into a fraudulent arrangement, whereby that agreement was to be cancelled, and Maurice was to be left out of the arrangement and thus defrauded out of his interest. The reason we come to this conclusion is, that Raleigh says so in the most explicit terms, and that every circumstance in the case corroborates his statement. Murphy makes a miserable failure in trying to explain in his answer, how the agreement came to be cancelled. Devol, in his answer does little better. Murphy and Devol made joint application for the patent, and recite this fact in their contract with Demming and Prager; then afterwards, Devol procures the patents alone, or the evidence tends to show this; again, while the Demming-Prager contract recites that Murphy and Devol were *joint inventors*, they both state in their answers, that the invention was Devol's alone, and then after Raleigh's clear statement of the fraudulent combination, *Devol fails entirely to have his own deposition taken.* We have no doubt Raleigh told the truth about it. The evidence fully convinces us, that there was no substantial difference in the machines, when Murphy claimed to be the inventor, and when Devol claimed to be the inventor. Raleigh in his answer, prayed for affimative relief, and to have his third of the proceeds of the sale to Demming and Prager paid to him. The court denied this.

The former judge of the circuit court of Wood county, on the 23d day of October, 1871, dissolved the injunction, and on application made on the 27th December, 1871, refused to reinstate it. If the case was then as it is now, the injunction ought not to have been dissolved.

On the 15th day of June, 1877, the court entered a decree against Murphy and Devol for the one third of the amount paid by Demming and Prager with interest and costs, and directed execution to issue therefor. From this decree J. L. Devol obtained an appeal with *supersedeas.*

The first error assigned is, that the court had no jurisdiction. Though the validity of a patent-right when directly adjudicated upon is within the exclusive jurisdiction of the

Federal courts, yet when it comes in question *collaterally*, it is a subject of inquiry in the State courts. Although a cause of action may relate to the subject-matter of a patent-right, it is within the jurisdiction of State courts, if it does not involve directly the validity of the patent-right. *Rich* v. *Hotchkiss*, 16 Conn. 409; *Lindsey* v. *Roraback*, 4 Jones Eq. 124; *Sherman* v. *Transportation Co.*, 31 Vt. 162; *Blakeney* v. *Goode*, 30 Ohio St. 350.

In a case like this a party will not be driven to his action at law. Equity always has jurisdiction of cases involving fraud of one party against the other, unless the party asking relief was himself guilty of fraud in the transaction. Here the fraud is distinctly charged and proved.

It is further insisted that there was no consideration for the alleged agreement. It seems to me the consideration is clearly proved. Nor do I think the agreement as alleged differs materially from that proved.

It is further insisted by counsel for appellant, that Devol had nothing to do with the contract between Murphy, the plaintiff, and Raleigh; that there is nothing to show that Devol's inventions are the same as Murphy's; that the ideas of Murphy according to the evidence on the point of identity with Devol's invention, are the merest vague opinions of inexpert minds. Devol shows his title to the inventions, and no proof exists to the contrary. It is true, as insisted by the counsel for the appellant, sustained by the authority which he cites, that letters-patent offered a *prima facie* presumption that the person named as inventor is the original and first inventor of what is there described as the improvement, and the burden of proof to sustain an opposite conclusion, is on him who denies that such person is the original inventor. (*Elizabeth* v. *Pavement Co.*, 97 U. S. 126; *Sugar Co.* v. *Matherson*, 3 Cliff. 639; *Sands* v. *Wardwell, Ibid.* 277; *Brodie* v. *Ophir Co.*, 5 Sawyer 608.) But this presumption has been rebutted in this case. From the whole evidence it seems to us, it cannot be doubted that the inventions for which Devol procured patents, are substantially the same, that Murphy invented, and, in the application for which patents *Murphy* and Devol joined; and that all this was done for the purpose of preventing Maurice from having any in-

terest in the inventions, and to destroy his rights by induc-
ing Raleigh to surrender and cancel the contract, to which
Maurice was a party. This, of course, cannot be tolerated
by a court of equity. It is claimed and insisted that Devol
had no notice of Maurice's intent. As we have before stated
it seems to us that it is clearly proved, that Devol entered
into the fraudulent scheme to deprive Maurice of any inter-
est in the inventions. It is said this is proved by Raleigh,
who admits his own perfidy; but Raleigh is corroborated in
different ways, some of which we have already pointed out.
I would sooner believe the statement of a man, who admits
his fraud and tries to have justice done to the one whom he
has attempted to wrong than that man who is guilty of the
same fraud, yet persists in denying it.

But it is insisted, that the subject of the contract "was
nothing more than an intangible, undeveloped, mechanical
hypothesis, a vague conception unsusceptible of any identity
at that time and by no possible means to be discriminated
from any other idea present or future in the mind of Murphy.
Such immateriality is not capaple of being sold and deliv-
ered." It is true, as appears in the cases cited by counsel,
that a person cannot sell his expectancy in a will of his
father already made in the lifetime of his father, because he
has no right to the bequest, until his father is dead. ( *Wheel-
er's Executor* v. *Wheeler*, 2 Metc. [Ky.] 474.) In that case it
was held, that such a contract was inoperative; "that the
thing sold must have an actual or potential existence. A
hope or expectation of means founded on a right in being
may be the subject of a sale, because in such case there is a
potential existence."

So in *Low* v. *Pew*, 108 Mass. 347, it was held for the same
reason, that a sale of fish hereafter to be caught passes no
title to the fish when caught. And carrying out the same
undisputed principle it was held in *Hutchison* v. *Ford*, 9
Bush. 318, that a mortgage of a crop to be raised on a farm
during a certain term, but which is not yet sown, passes no
title, and the mortgagee has no claim against a purchaser of
the crop for it, or its value.

*Gayler* v. *Wilder*, 10 How. 477, cited by counsel for appel-
lant, was an action at law, and in the dissenting opinion

Daniel, J., at page 503, uses the language quoted in appellant's brief, that "the mere mental process of devising an invention enters not into the nature of property according to the common-law; it forms no class or division in any of its enumerations or definitions of estates or property, and is a matter quite too shadowy for the practical character of that sturdy system." In that case the court held, that the assignment of a patent-right made and recorded in the patent-office before the patent issued, which puported to convey to the assignee all the inchoate right, which the assignee then possessed, as well as the legal title, which he was about to obtain, was sufficient to transfer the right to the assignee, although a patent was afterwards issued to the assignee.

In *Hartshorn* v. *Day*, 10 How. 211, it was held, that where a patentee is about to apply for a renewal 'of his patent, and agrees with another person, that in case of success he will assign to him the renewed patent, and the patent is renewed, such an agreement is valid, and conveys to the assignee equitable title, which can be converted into the legal title by paying or offering to pay the stipulated consideration.

In *Rathbone* v. *Orr et al.*, 5 McLean 131, it was held, that an inventor may sell his invention before he obtains a patent; and after the patent is obtained, the contract will secure to the assignee the extent of his right.

In *Nesmith* v. *Calvert*, 1 Woodb. & M. 34, it was held, that a contract may be made to convey a future invention as well as a past one, and for any improvement or maturing of a past one. In that case the contract was to sell and assign a patent already existing, and improvements about to be made.

At the time Murphy made the contract with Maurice and Raleigh, the invention for the split-cutter and loom both had a potential existence, and he could very well assign an interest therein. The contract provided that he was to have a loom completed in ten days, that would weave one hundred yards of window-blind in ten hours, according to Murphy's statement of the contract. If he could complete such a loom, and make it do such work in that length of time, he certainly had something more than an *idea*. The witnesses to the contract say, that the contract recites that Murphy had filed *caveats* to *protect his invention*. He could not have done that if it was a

mere "intellectuality." Other witnesses about the same time had talked to him about the inventions, and they say the machines, which he then described, were *substantially* the same as those patented to Devol. Murphy says that he abandoned the *plan* of his *loom* about the middle of March, and that some time after Devol asked him if he had entirely abandoned it. Only five days thereafter, March 20, 1871, according to Raleigh's testimony, which Devol does not contradict, for his deposition is not taken, Devol and Murphy called upon Raleigh to get him to cancel the agreement, and had papers already drawn for securing patents on the same machines in the name of Devol and Murphy. All this shows that at the time the contract between the plaintiff Murphy and Raleigh was made, the inventions had a potential existence.

It is insisted that this is a hard bargain, which will not be enforced. We cannot say that it was such a bargain. Of such a bargain Judge Woodbury, in *Nesmith* v. *Calvert*, 1 Woodb. & M. 41, says: "F. A. Calvert was in embarrassed circumstances, and the complainants relieved him by the advances made in October, when the second deed was executed; and that such engagements for the real benefit of inventors ought to be viewed liberally when they tend to enable the inventors to continue their efforts, and eventually contribute to the public means and for advancing useful industry and the arts." If the inventions had been a great success, two hundred dollars might have been more to Murphy in his straightened circumstances than two thousand dollars would be after success was assured.

It is insisted, that Murphy had no letters-patent for his inventions, and Maurice had not recorded the agreement and until patented Devol had the right to his own inventions. In answer it may be said, that the proof shows the inventions were Murphy's, not Devol's, and that Devol had actual notice of the claim of Maurice. An agreement which operates as a transfer of a patent or any interest therein is good against a patentee and those who purchase with notice, though not recorded. *Windmill Co.* v. *Windmill Co.*, 8 Blatch. 296.

It is claimed, that if Devol and Murphy could be held bound to the plaintiff in any sum, it should be after an account of Devol's expenses in obtaining the patents. Devol having

incurred such expenses through fraud is not entitled to be credited therewith, as against Maurice.

But it is insisted, that in any view of the case that the allowance to Maurice is inequitable, because Maurice claiming a one third interest in the inventions was entitled, if to anything, to only one third of the sum, which the one third sold to Demming and Prager brought. According to the contract the interest of Maurice was one third in the inventions and all profits arising therefrom. This relief he asked. The court did not relieve him to this extent but in full of his whole interest gave him one third of the amount of the sale to Demming and Prager, reserving to him no right in the remaining unsold one third. If Maurice does not complain the appellant should not. The court certainly gave him no more than he was entitled to.

For appellee Raleigh it is insisted, that he ought to have received the relief asked in his prayer, for affirmative relief. It was properly denied. He cannot be relieved in this proceeding. He admits the fraud, by which he and Devol and Murphy endeavored to destroy the interest of Maurice. A court of equity will not in a suit to relieve the sufferer from such fraud also relieve a conspirator in the fraud.

We see no error in the decree of the circuit court and it is therefore affirmed.

AFFIRMED.